**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| ROCIO DEL CARMEN R., | : | |
| | : | |
| Petitioner, | : | Civil Action No. 20-3875 (ES) |
| | : | |
| v. | : | OPINION |
| | : | |
| THOMAS DECKER, *et al.*, | : | |
| | : | |
| Respondents. | : | |
| | : | |

SALAS, DISTRICT JUDGE

Before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 filed by petitioner Rocio Del Carmen R.[1] ("Petitioner"). (D.E. No. 21 ("Petition" or "Pet.")). Also before the Court is Petitioner's motion for an order to show cause, preliminary injunction and temporary restraining order requesting immediate release from immigration detention based on the current COVID-19 pandemic. (D.E. No. 22 ("Motion")). The Court has reviewed the parties' submissions and decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons that follow, the Petition and the Motion are DENIED.

I.     **Background**

A.     **Procedural History**

Petitioner is an individual in the custody of U.S. Immigration and Customs Enforcement ("ICE") who is detained at the Hudson County Correctional Center ("HCCC") in New Jersey

---

[1]      This Opinion identifies Petitioner by her first name and the first initials of her surname in light of certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with the Judicial Conference of the United States' Committee on Court Administration and Case Management's recommendations.

pending completion of her removal proceedings.   (Pet. ¶ 48).   Petitioner, a thirty-eight-year-old

native of the Dominican Republic, entered the United States as a lawful permanent resident in

1987 at age six.   (Pet. ¶ 48; D.E. No. 25 ("Hernandez Decl.") ¶ 4).   On October 21, 2016,

Petitioner was arrested and charged with (i) second degree robbery in violation of New York Penal

Law § 160.10(1); (ii) fourth degree criminal possession of stolen property in violation of New

York Penal Law § 165.45(2); (iii) fourth degree grand larceny in violation of New York Penal Law

§ 155.30(4); (iv) second degree endangering the welfare of an incompetent/physically disabled

person in violation of New York Penal Law § 260.24; and (v) petit larceny in violation of New

York Penal Law § 155.25.   (Hernandez Decl. ¶ 5).   On August 10, 2017, Petitioner ultimately

pled guilty to (i) second degree attempted robbery, a Class D Felony; and (ii) acting in a manner

injurious to a child under age 17.   (*Id.* ¶¶ 6–7; D.E. No. 26-5 at 3–5; *see* Pet. ¶ 48).[2]   Petitioner

was sentenced to three-years imprisonment.   (Hernandez Decl. ¶¶ 6–7).

Petitioner was served with a notice to appear by ICE on December 18, 2018.   (*Id.* ¶ 8).

Because Petitioner's felony conviction subjects her to mandatory detention pursuant to Section

236(c) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1226(c), ICE has detained

Petitioner at HCCC since at least June of 2019.[3]   (Pet. ¶ 48; *see* Hernandez Decl. ¶ 8).   On

October 17, 2019, Petitioner's application for withholding of removal under INA § 241(b)(3) and

for protection under the United Nations Convention Against Torture was denied by an Immigration

Judge ("IJ"), and Petitioner was ordered to be removed to the Dominican Republic.   (*See* Pet. ¶

---

[2]     Respondents note that Petitioner's record includes additional convictions from the late 2000s.   (D.E. No. 26 ("Opp. Br.") at 8; D.E. No. 26-5).

[3]     Respondents contend that Petitioner has been detained in ICE custody since May 9, 2019, but fail to specify whether Petitioner was initially detained at a different facility before that date.   (*See* Opp. Br. at 8; *see* Hernandez Decl. ¶ 8).

48; Hernandez Decl. ¶ 10).   Petitioner's November 4, 2019 appeal of the IJ's order of removal is currently pending before the Board of Immigration Appeals.   (*See* Pet. ¶ 48; Hernandez Decl. ¶ 10).   Subsequently, Petitioner's March 30, 2020 request for discretionary parole from ICE was denied on April 8, 2020.   (Pet. ¶ 15 n.3; Hernandez Decl. ¶ 12).

On April 3, 2020, Petitioner filed a petition for writ of habeas corpus challenging her immigration detention under 28 U.S.C. § 2241 in the United States District Court for the Southern District of New York.   (D.E. No. 1 ("Initial Petition")).   Petitioner then moved for an order to show cause, preliminary injunction and temporary restraining order on April 7, 2020.   (D.E. No. 6).   On the same day, the respondents to the Initial Petition filed an expedited motion to transfer the action to this Court for lack of jurisdiction because Petitioner remains detained in New Jersey. (D.E. No. 11).   On April 9, 2020, District Judge J. Paul Oetken of the Southern District of New York granted respondents' motion to transfer.   (D.E. No. 15).   Petitioner filed the instant Petition and Motion on April 14, 2020, seeking immediate release in light of the current COVID-19 pandemic.   (*See generally* Pet.; *see also* Motion).   Respondents filed an opposition to the Motion on April 17, 2020 (Opp. Br.), and Petitioner filed a reply on April 20, 2020 (D.E. No. 27 ("Reply Br.")).

### B.   COVID-19

COVID-19, or the novel coronavirus disease 2019, "is an infectious disease caused by a newly discovered coronavirus." [4]   *Coronavirus Overview*, World Health Organization, https://www.who.int/health-topics/coronavirus#tab=tab_1. (last visited Apr. 28, 2020) (hereinafter

---

[4]      On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.   *See* William Wan, *WHO declares a pandemic of coronavirus disease covid-19*, Washington Post (Mar. 11, 2020, 3:45 PM), https://www.washingtonpost.com/health/2020/03/11/who-declares-pandemic-coronavirus-disease-covid-19/.

"*Coronavirus Overview*").   The World Health Organization reports that COVID-19 "is spreading very easily and sustainably between people."   *How COVID-19 Spreads*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. (last visited Apr. 28, 2020).   The person-to-person spread of COVID-19 can occur (i) between individuals who are in close contact, meaning within about six feet, and (ii) by an infected individual's respiratory droplets produced from sneezing, coughing, or talking.   *Id.* The virus can also be spread by infected but asymptomatic individuals.   *Id.*   However, "[m]ost people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment."   *Coronavirus Overview*.

Although COVID-19 symptoms can be mild, the Centers for Disease Control and Prevention ("CDC") identified certain groups of individuals who might have a higher risk for developing severe illness from COVID-19, including:   (i) individuals 65 years and older as well as nursing home/long-term care facility populations; (ii) individuals with underlying medical conditions such as "chronic lung disease or moderate to severe asthma," "serious heart conditions," severe obesity, diabetes, "chronic kidney disease undergoing dialysis," and liver disease; and (iii) individuals who are immunocompromised from "cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications."   *See People Who Are at Higher Risk for Severe Illness*,   CDC,   https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. (last visited Apr. 28, 2020) (hereinafter "*People Who Are at Higher Risk for Severe Illness*").

It is difficult to overstate the severity of the COVID-19 outbreak and the global crisis that

society is facing in light of this unprecedented public health crisis.   As of April 27, 2020, in New

Jersey alone, there have been 111,188 positive COVID-19 cases and 6,044 COVID-19 related

deaths.   *COVID-19 Information Hub*, State of New Jersey, https://covid19.nj.gov/. (last visited

Apr. 28, 2020).   Hudson County, the locality of HCCC, has 13,925 cases and 673 deaths.   *Id.*

Certainly, it is well documented and undisputed that COVID-19 has taken the lives of many and

presents an enormous risk to us all, including those in jails and detention centers.   *See Thakker v.

Doll*, No. 20-480, 2020 WL 1671563, at *4 (M.D. Pa. Mar. 31, 2020).   The seriousness of the

outbreak is extensively detailed in the parties' submissions and is undisputed by the Respondents.

(Opp. Br. at 2).

### C.     Petitioner's Underlying Medical Conditions

At the outset, the Court notes that the Petitioner's Initial Petition was accompanied by one

affidavit from a clinical psychologist dated September 2019, stating that Petitioner "meets

diagnostic criteria for a Major Depressive Disorder, recurrent, with anxious distress and for a

Posttraumatic Stress Disorder, chronic."   (*see* D.E. No. 1-3 ("Ex. C to Initial Petition")).   Other

than the psychologist's affidavit, Petitioner did not file any additional affidavit or declaration—by

Petitioner or any other individual on her behalf—with either the Initial Petition, the present

Petition, or the memorandum of law in support of the Petitioner's Motion.   In reply to the

Respondents' opposition, Petitioner filed a seven-page, twenty-one paragraph declaration from

counsel, signed on Petitioner's behalf, based on four telephone and video conversations between

counsel and Petitioner.   (D.E. No. 27-1 ("Declaration of Ms. Chua" or "Chua Decl.") ¶ 3).

Petitioner is a thirty-eight-year-old female who is currently detained by ICE at HCCC.

(Pet. ¶ 3; D.E. No. 23 ("Mov. Br.") at 1).   She reports having "asthma, major depressive disorder

-5-

with anxious distress, and post-traumatic stress disorder."   (Pet. ¶ 7; D.E. No. 23 ("Mov. Br.") at 1; *see also* D.E. No. 1-2 ("Ex. B to Initial Petition"); Ex. C to Initial Petition).[5]   Through counsel's declaration, Petitioner submits that her asthma is exacerbated from a history of smoking one package of cigarettes per day since age seventeen until approximately last year.[6]   (Chua Decl. ¶ 11; *see also* Pet. ¶ 21).

While previously incarcerated at the Albion Correctional Facility, Petitioner received asthma treatment in the form of a prescribed inhaler for weekly one-time use.   (Ex. B to Initial Petition; Chua Decl. ¶ 10; Pet. ¶ 21).   Although Petitioner had an inhaler at some point in early 2019, she claims that she has been unable to obtain an inhaler while at HCCC.   (Ex. B to Initial Petition; Chua Decl. ¶ 12; Pet. ¶ 21).   Since her detainment at HCCC, Petitioner allegedly requested treatment for her asthma, including at least two times from a computerized kiosk—once in March of 2020 and the second time on or about April 15, 2020.   (Chua Decl. ¶ 12).   Petitioner reports that she has not seen a doctor for her asthma.   (*Id.* ¶ 13).

As of April 20, 2020, Petitioner did not report experiencing any flu-like symptoms, difficulty breathing or fever, nor has she been tested for COVID-19.   (*See generally id.*; *see also id.* ¶ 15).   Since being confined for twenty-three hours per day, Petitioner has experienced anxiety and depression, and feelings of being kept "hostage," triggering memories from past relationships. (*Id.* ¶ 9).

---

[5]       Respondents state that Petitioner's medical records reflect that she has "depression, anxiety, high cholesterol, and was taking a medication (diphenhydramine) used to treat allergies."   (Opp. Br. at 9 (citing Hernandez Decl. ¶ 13, Ex. A)).   The Court notes that Petitioner's claims do not rest on any purported high cholesterol or allergies.   (*See generally* Pet.; *see also* Mov. Br.).

[6]       The Petition states that Petitioner began smoking from at least age eighteen.   (Pet. ¶ 21).

### D.    Conditions at HCCC

The parties' submissions highlight that HCCC, like many institutions across the country, has had positive COVID-19 cases among inmates and staff.[7]  In support of their opposition, Respondents provided a second amended declaration from Ron Edwards, the Director of the Hudson County Department of Corrections and Rehabilitation, which describes the conditions and measures HCCC has implemented to combat the spread of COVID-19.   (*See generally* D.E. No. 26-4 ("Declaration of Mr. Edwards" or "Edwards Decl."); *see also id.* ¶ 1).   As of April 13, 2020, HCCC reported eight positive COVID-19 cases amongst ICE detainees, five of whom were released from custody.  (*Id.* ¶ 20(a)).   In addition, twenty-four inmates and seventy HCCC staff members tested positive for COVID-19.   (*Id.* ¶ 20(b)–(c)).   Of the thirty-two detainees and inmates who have tested positive, there have been twenty-eight full recoveries.  (*Id.* ¶ 22). Unfortunately, four HCCC personnel, including two nurses, have died from COVID-19 related complications.  (*Id.* ¶ 21).

The record before the Court reflects that HCCC has affirmative measures in place to help combat the spread of COVID-19 among inmates and staff.  (*See id.*).   For example, HCCC is operating on a "Restrictive Schedule," meaning that inmates and detainees are allowed outside of their cells for approximately one hour per day (in two thirty-minute intervals), and communal areas are cleaned "continuously during a 16-hour period."  (*Id.* ¶ 11).   Rather than allowing the typical number of sixty-two inmates/detainees out for recreation at one time, only two inmates/detainees are permitted to leave their cell for the thirty-minute period, to ensure proper social distancing in accordance with the CDC's guidelines.  (*Id.* ¶ 12(k)).   Housing units are also locked down

---

[7]        Because the sources cited in the Declaration of Ms. Chua on behalf of Petitioner appear to be outdated (*see* Chua Decl. ¶ 2 nn.1–2 & 4), the Court will rely on the more recent numbers reported by Respondents.

between shifts for sanitizing.   (*Id.* ¶ 11).   HCCC has increased cleaning at the facility, adding additional staff during late-night shifts to clean and disinfect.   (*Id.* ¶ 12(e)).   In addition, all inmates and detainees are given two bars of soap and disinfectant wipes, and they may request more of each.   (*Id.* ¶¶ 11 & 19).   As of April 13, 2020, all inmates and detainees have received surgical masks.   (*Id.* ¶ 24).   All HCCC staff has gloves, N-95 masks, and eye protection; nurses are provided coveralls or gowns.   (*Id.* ¶ 13(c)).

With respect to medical care, HCCC has a twenty-four hour on-call physician for emergencies, and it has medical staff, including registered nurses and nurse practitioners, onsite for twenty-four hours each day.   (*Id.* ¶ 7).   HCCC designated a specific housing unit to quarantine those inmates and detainees who have tested positive for COVID-19 or are suspected to be positive.   (*Id.* ¶¶ 12(g) & 15).   The quarantine unit is operating under capacity and cells inside the unit are separated such that detainees may remain at least six feet apart from one another.   (*Id.* ¶ 16).   For those detainees or inmates who suffer from medical conditions the CDC has identified as posing a high risk for development of serious illness or death from COVID-19, HCCC established new protocol, including daily monitoring of these inmates, and an established plan to separate such persons from the remaining population should the HCCC Medical Department deem it necessary.   (*Id.* ¶ 12(g)).   Symptomatic detainees who are awaiting test results may begin anti-viral medication depending on the severity of symptoms; their vitals are monitored daily and they are evaluated for hospitalization.   (*Id.* ¶ 16).   Asymptomatic and exposed detainees are housed together, and their movement is restricted during a fourteen-day incubation period, in a process known as "cohorting."   (*Id.* ¶ 17).   HCCC medical staff immediately evaluate any inmate or detainee who complains of illness or symptoms; requests for medical care can be made on a tablet

-8-

or to a nurse that will visit cells twice per day.   (*Id.* ¶ 14).   All elective medical procedures are postponed and all outside consultations have been transitioned to telemedicine.   (*Id.* ¶ 12(g)). The facility also maintains a thirty-day supply of medication.   (*Id.*).   Twice each day, medical staff visit cells to check on each inmate or detainee's medical and mental health.   (*Id.* ¶ 13(d)).

With respect to new admissions, HCCC has halted the acceptance of detainees who were arrested at the border and "in the United States but have not been tested for COVID-19 and medically cleared."   (*Id.* ¶ 12(a)).   All new admissions are medically assessed by a registered nurse, which includes a temperature check in a separate external holding area; entry is denied for persons presenting with a temperature above 100.4 degrees.   (*Id.* ¶ 12(b)).   Additionally, all new admissions are placed on lock down.   (*Id.* ¶ 12(b)).   The facility's intake/property area is cleaned and sanitized after each shift change and court movement.   (*Id.*).   Medical staff also conduct medical screenings of all civilian, staff, and vendors before they enter the facility, and those presenting with a temperature above 100 are denied entry.   (*Id.* ¶ 12(c) & 12(g)).

Since March 8, 2020, all tours and in-person social visitations have been suspended, and video visitation is permitted.   (*Id.* ¶ 12(h)).   Inmates and detainees may communicate with their attorneys via confidential telephone calls, free audio-video means, or through non-contact in-person visits with a glass partition between the attorney and his or her client.   (*Id.* ¶ 12(i)–(j)). Sanitation of these visiting areas occur after each visit.   (*Id.* ¶ 12(i)).   Video conferencing is also available to all detainees for their judicial proceedings.   (*Id.* ¶ 13(b)).

According to Petitioner, she has been confined to her cell for twenty-three hours a day with one disposable surgical mask and no gloves.   (Chua Decl. ¶¶ 5–6).   Inmates are not required to wear masks, nor do staff members consistently wear masks.   (*Id.* ¶¶ 5 & 16).   Petitioner receives

meals from an unmasked detainee.   (*Id.* ¶ 17).   She reports that common areas are cleaned once per day, and that she is given cleaning supplies once per day to clean her cell.   (*Id.* ¶¶ 6–7).   To her knowledge, the recreation room and communal phones are not sanitized between use.   (*Id.* ¶ 8).   Petitioner reports that she has not received twice-daily medical checks; rather, she's been seen once per month from a mental health professional staff member.   (*Id.* ¶ 14).

Petitioner shares a cell, toilet and sink with a detainee who reported having headaches, chest pains, and trouble breathing approximately two weeks prior to counsel's declaration on Petitioner's behalf, dated April 20, 2020.   (*Id.* ¶¶ 19–20).   Petitioner's bunkmate saw a doctor, returned to Petitioner's shared cell, and according to Petitioner, was never offered a test for COVID-19.   (*Id.* ¶ 20).   Petitioner remains detained with the same bunkmate.   (*Id.* ¶ 21).

## II.   Jurisdiction

As a preliminary matter, Respondents argue that the Petition and Motion for a temporary restraining order requesting release are not proper vehicles for challenging her conditions of confinement.   (Opp. Br. at 18).   Rather, Respondents imply that such a claim should be alleged in the context of a prisoner civil rights action under Section 1983.   (*Id.*).

Traditionally, 8 U.S.C. § 1983 is the proper statute under which prisoners have asserted conditions of confinement claims.   *See e.g.*, *Camacho Lopez v. Lowe*, No. 20-563, 2020 WL 1689874, at *4–6 (M.D. Pa. Apr. 7, 2020).   Conversely, challenges to "the fact or length of confinement" are properly brought in a habeas corpus petition.   *See Tedford v. Hepting*, 990 F.2d 745, 748 (3d Cir. 1993) (quoting *Preiser v. Rodriguez*, 411 U.S 475, 494 (1973)).   Here, Petitioner seeks immediate release or a bail hearing, which are remedies available through a habeas petition, not in a civil rights action.   *See, e.g.*, *Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532,

540 (3d Cir. 2002).   There is currently no Third Circuit or Supreme Court decision that directly addresses whether a conditions of confinement claim may be raised in a habeas corpus petition. *Camacho*, 2020 WL 1689874, at *5; *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–42 (3d Cir. 2005).   However, the Supreme Court has stated that "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."   *Preiser*, 411 U.S. at 494; *see also Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862–63 (2017).   Similarly, the Third Circuit has alluded to the possibility of a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action *only in extreme cases*."   *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978) (emphasis added).

After reviewing the applicable Supreme Court and Third Circuit precedent, many other courts in the Third Circuit have permitted petitioners to raise conditions of confinement challenges through habeas petitions.   *See e.g.*, *Jorge V.S. v. Green*, No. 20-3675, 2020 WL 1921936, at *2 (D.N.J. Apr. 21, 2020); *accord Camacho*, 2020 WL 1689874, at *4–6; *Umarbaev v. Lowe*, No. 20-0413, 2020 WL 1814157, at *5 (M.D. Pa. Apr. 9, 2020).   Accordingly, the Court agrees with the line of cases that have allowed conditions of confinements claims to proceed in habeas corpus petitions, and will allow the Petitioner to pursue a claim challenging her conditions of confinement in the present habeas corpus Petition.

Moreover, habeas relief may be extended to a prisoner pursuant to 28 U.S.C. § 2241(c) only when he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).   A federal court has jurisdiction over such a petitioner if he is "in custody" and the custody is allegedly "in violation of the Constitution or laws or treaties of the United

States."   28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).   Here, the Petitioner

is currently detained in a locality within this Court's jurisdiction and by a custodian located within

the Court's jurisdiction.   The Petition and application for a preliminary injunction and restraining

order asserts that Petitioner's continued detention violates due process protected under the

Constitution.   Accordingly, this Court has jurisdiction over her claims.   *See Spencer v. Kemna*,

523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494–95, 500 (1973);

*see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

## III.    Legal Standards

### A.    Temporary Restraining Order

Requests for preliminary injunctions and temporary restraining orders are governed by

Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.   Injunctive relief is generally "an

extraordinary remedy" and "should be granted only in limited circumstances."   *Am. Tel. & Tel.*

*Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal

quotation marks omitted); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

To obtain a temporary restraining order, the moving party must show: "(l) a likelihood of success

on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting

preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the

public interest favors such relief."   *Kos Pharm., Inc.*, 369 F.3d at 708; *accord New Jersey Retail*

*Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385–86 (3d Cir. 2012) (citing *Crissman v.*

*Dower Down Entm't Inc.*, 239 F. 3d 357, 364 (3d Cir. 2001)).   Moreover, because the Petitioner's

request for a preliminary injunction would alter the status quo *pendente lite* until a decision on

merits can be reached, Petitioner's burden to show that she will suffer an immediate irreparable

injury is particularly high.   *See Acierno v. New Castle Cty.*, 40 F.3d 645, 647, 653 (3d Cir. 1994);
*see also Sandhills Glob., Inc. v. Garafola*, No. 19-20669, 2020 WL 1821422, at *13 (D.N.J. Apr.
10, 2020).

The movant must, as a threshold matter, establish the two "most critical" factors: likelihood
of success on the merits and irreparable harm.   *Reilly v. City of Harrisburg*, 858 F.3d 173, 179
(3d Cir. 2017).   Under the first factor, the movant must show that "it can win on the merits."   *Id.*
This showing must be "significantly better than negligible but not necessarily more likely than
not."   *Id.*   The second factor carries a slightly enhanced burden: the movant must establish it is
"more likely than not" to suffer irreparable harm absent the requested relief.   *Id.*   If these
"gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to
balance the equities by examining the potential for harm to others if relief is granted and whether
the public interest favors injunctive relief.   *Id.* at 176, 179.   The Court must then balance all four
factors to determine, in its discretion, whether the circumstances warrant injunctive relief.   *Id.* at
179.

### B.      The "Extraordinary Circumstances Standard" for Bail

Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary
remedy.   *See Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court
may only grant release pending a disposition of federal habeas claims when the petitioner has
raised "substantial constitutional claims upon which he has a high probability of success, and . . .
when extraordinary or exceptional circumstances exist which make the grant of bail necessary to
make the habeas remedy effective") (citation omitted)); *see also In re Souels*, 688 F. App'x 134,
135–36 (3d Cir. 2017).   The Third Circuit's decision in *Lucas v. Hadden* established that

"extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."  790 F.2d 365, 367 (3d Cir. 1986).  In *Lucas*, the Third Circuit noted that extraordinary circumstances may be established where the district judge ordered the release of a state inmate to a hospital because the inmate was extremely ill.  *Id.* at 366–67 (citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955)).  The panel, however, did not expressly limit the finding of extraordinary circumstances to situations involving a petitioner's poor health. *Id.* at 367.  Recent decisions have applied this standard to determine whether extraordinary circumstances exist, in the context of the COVID-19 pandemic, to grant bail to immigration habeas petitioners.  *See*, *e.g.*, *Ousman D. v. Decker*, No. 20-2292, 2020 WL 1847704, at *8–10 (D.N.J. Apr. 13, 2020); *Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *8 (S.D.N.Y. Mar. 27, 2020) (applying an analogous Second Circuit standard set forth in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)).

## IV.    Discussion

Petitioner alleges that her due process rights are violated under the Fifth Amendment because Petitioner's underlying medical conditions make her more vulnerable to contracting COVID-19 and to developing severe symptoms should she become infected.  (Mov. Br. at 15–16).  Petitioner's due process challenges arise under two theories.  First, she asserts that Respondents are deliberately indifferent to Petitioner's medical needs by (i) failing to provide adequate safety measures to prevent the spread of the virus, and (ii) failing to provide her with adequate medical care in light of her conditions.  (Pet. ¶¶ 61–65, 74 & 76–79; Mov. Br. at 8–10 & 12; *see generally* Chua Decl.).  Second, Petitioner contends that Respondents' failure to adequately protect the Petitioner from the punitive conditions of her confinement amounts to

unconstitutional punishment.   (Pet. ¶¶ 55–60 & 73; Mov. Br. at 10–11).

Because the Third Circuit and Supreme Court have yet to provide judicial guidance on how to navigate these claims in light of the unprecedented pandemic, the Court notes that there have been varying opinions among federal district courts throughout the country.[8]   In this context and in the wake of COVID-19, the Court considers Petitioner's habeas corpus Petition and Motion with the utmost gravity.   For the reasons that follow, the Court finds that Petitioner has not established a reasonable likelihood of success on the merits of her claims or irreparable harm, and thus is not entitled to a temporary restraining order or preliminary injunctive relief.

### A.    Likelihood of Success on the Merits

Under the Due Process Clause of the Fifth Amendment, the federal government shall not deprive any person "of life, liberty, or property without due process of law."   *See* U.S. Const. amend. V.   "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects," which "applies to all persons in the United States, including aliens, whether their presence is lawful, unlawful, temporary or permanent."   *Zadvydas*, 533 U.S. at 690, 693.   It follows that alien detention must comport with the United States Constitution.   Unless government detention is ordered in a criminal matter with appropriate procedural safeguards, that detention violates the Due Process Clause of the Fifth Amendment.   *Id.*   However, under certain "'narrow' nonpunitive

---

[8]      *Compare Cristian A.R. v. Decker*, No. 20-3600 (D.N.J. Apr. 12, 2020); *Rafael L.O. v. Decker*, No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020), *with Graham v. Decker*, No. 20-2423, 2020 WL 1847568, at *4 (S.D.N.Y. Apr. 13, 2020); *Umarbaev v. Lowe*, No. 20-00413, 2020 WL 1814157 (M.D. Pa. Apr. 9, 2020); *Lopez v. Lowe*, No. 20-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020); *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020); *Dawson v. Asher*, No. 20-409, 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020).

'circumstances,' [a] special justification" may outweigh "'the individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* (internal citation omitted). Here, Petitioner contends that her detention violates the Due Process Clause under the Fifth Amendment in light of the COVID-19 pandemic because Respondents are deliberately indifferent to the conditions of Petitioner's confinement given her underlying medical needs and because her conditions and confinement amount to punitive punishment. (Pet. ¶¶ 56–57; Mov. Br. at 10 & 15).

Traditionally, conditions of confinement claims by sentenced prisoners arise under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 27–28 (1993). For example, in *Helling*, the plaintiff was imprisoned with a cellmate who was a heavy smoker. *Id.* Plaintiff filed a civil rights action arguing that he had been involuntarily exposed to levels of secondhand smoke that posed an unreasonable risk of harm to his future health. *Id.* In weighing plaintiff's conditions of confinement claim, the Court recognized that inmates are entitled to relief under the Eighth Amendment where they prove threats to personal safety from the exposure to serious contagious diseases. *Id.* at 33–34 (noting that the Eighth Amendment requires a remedy when "inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease") (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)). The Court further concluded: "[n]or can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Id.*

Because Petitioner is an immigrant detainee under 8 U.S.C. § 1226(c), rather than a convicted prisoner, her claim is one grounded in due process under the Fifth Amendment, not the

Eighth Amendment.   *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019).   However, while *Helling* is a conditions of confinement claim by a sentenced prisoner, and therefore arises under the Eighth Amendment, its application of the deliberate indifference standard and reasoning are nonetheless relevant in the context of a conditions of confinement claim brought by an immigration detainee.   Moreover, the Third Circuit has made clear that immigration detainees bringing conditions of confinement due process claims are entitled to the same due process protections as pre-trial detainees.   *Sharkey*, 928 F.3d at 306–07; *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008) ("[W]hen pretrial detainees challenge their conditions of confinement, we must consider whether there has been a violation of the Due Process Clause . . ."); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).   Thus, the Court will proceed by analyzing Petitioner's alleged Fifth Amendment due process violations challenging the conditions of her confinement under the deliberate indifference framework.

### i.      Deliberate Indifference Claims

First, Petitioner claims that Respondents are deliberately indifferent to her medical needs in light HCCC's inadequate COVID-19 prevention efforts and HCCC's failure to provide her with medical care.   (Pet. ¶¶ 61–65, 74 & 76–79; Mov. Br. 8–10 & 12; *see generally* Chua Decl.).   To establish a claim for deliberate indifference to medical needs under the Due Process Clause, the Petitioner must show that (i) she has a serious medical need; and (ii) that the acts or omissions by HCCC officials were deliberately indifferent to Petitioner's medical need.   *See, e.g.*, *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581–82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159–60 (3d Cir. 2017).   The Supreme Court has stated that deliberate indifference to a prisoner's medical needs exists only if "the official knows of and disregards an excessive risk to

inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   This standard requires that the officials were "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . dr[e]w th[at] inference."   *Natale*, 318 F.3d at 582.

Here, Petitioner asserts that she has "asthma, major depressive disorder with anxious distress, and post-traumatic stress disorder" ("PTSD").   (Pet. ¶ 7; Mov. Br. at 1).   Petitioner contends that because these conditions will cause stress, particularly when isolated in her cell, they ultimately elevate her risk of infection and increase the likelihood that she will develop severe symptoms should she contract COVID-19.   (Mov. Br. at 12–14).   She also claims that her history of smoking and panic attacks pose the same increased risks in light of the virus.   (Pet. ¶ 10; Reply Br. at 5 & 12–13).   In support of her underlying conditions, Petitioner refers the Court to (i) a one-page Asthma Interim Visit Report from the Albion Correctional Facility in Albion, New York, dated February 2019 (Mov. Br. at 12 n.9 & Chua Decl. ¶ 10 n.6 (citing Ex. B to Initial Petition)), and (ii) the affidavit from Rachel Levenson, Ph.D. dated September 2019. (Mov. Br. at 12–13 nn.10 & 13–14 (citing Ex. C to Initial Petition)).

Notably, Petitioner's Asthma Interim Visit Report—the sole record submitted by Petitioner to substantiate her asthma diagnosis—is from an evaluation that occurred over one year ago on February 6, 2019.   (Ex. B to Initial Petition).   Moreover, this record indicates that at the time, Petitioner's asthma was mild and intermittent, and that an inhaler was proscribed for use once per week.   (*Id.*).   Although this record reflects that the letter "Y" was circled adjacent to "Smoking," indicating that the Petitioner answered "yes" to "smoking,"[9] it does not provide any details on the frequency, extent or side effects of Petitioner's smoking.   (*See id.*).   Thus, the only additional

---

[9]        It is not clear, however, whether "Y" was circled on the Asthma Interim Visit Report to denote that Petitioner was actively smoking at the time, had a prior history of smoking, or both.   (*See* Ex. B to Initial Petition).

information before the Court indicative of Petitioner's smoking history is contained in one sentence of counsel's declaration on behalf of Petitioner.  (*See* Chua Decl. ¶ 11 (stating that Petitioner "smoked one pack of cigarettes a day from the time that she was 17 years old until approximately one year ago")).

Respondents contend that Petitioner's medical records maintained by HCCC do not indicate that Petitioner has asthma or PTSD.  (Opp. Br. at 9 & 25–26; D.E. No. 25-1, Ex. A to Hernandez Decl. ("HCCC Records")).  Rather, the nearly eighty pages of Petitioner's HCCC medical records reflect no indication of asthma, difficulty breathing, use of an inhaler, or PTSD.  (*See generally* HCCC Records).  Nor does Petitioner dispute that Petitioner's HCCC medical records do not contain this medical history.  (*See generally* Reply Br.).  Indeed, Petitioner also does not contest that these medical records do, in fact, reflect that (i) on January 17, 2020, a nurse practitioner noted Petitioner had no trouble breathing, and (ii) on March 31, 2020, Petitioner did not complain of difficulty breathing.  (HCCC Records at 58 & 66).[10]

While the Court is sympathetic to the purported medical conditions asserted by Petitioner, the Court must conclude, on the basis of the record before it, that Petitioner's evidentiary showing fails to support a finding of a likelihood of success on the merits of her claim that Respondents acted deliberately indifferent to her alleged medical needs.[11]  First, as outlined above, the Court

---

[10]      The Court refers to the exhibit's ECF pagination.

[11]      Although other decisions in this district have held otherwise, this Court does not have the benefit of comparing the records in each of those particular cases.  *See Leandro R.P. v. Decker*, No. 20-3853, 2020 WL 1899791 (D.N.J. Apr. 17, 2020); *Jeferson V.G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. April 15, 2020).  These cases, and the records therein, have no bearing on this Petitioner's individualized circumstances.  *See Leandro R.P.*, 2020 WL 1899791, at *1 (stating that the court's "decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case"); *Jeferson V.G.*, 2020 WL 1873018, at *1 (same).  Similarly, other decisions in this Circuit that have granted detainees release do not demonstrate that this particular Petitioner is likely to succeed on the merits of her individual claims.  *See Buleishvili v. Hoover*, No. 20-607, 2020 WL 1911507, at *5 (M.D. Pa. Apr. 20, 2020) (denying petitioner's deliberate indifference claim, noting that "[t]he threshold problem with [petitioner]'s position is that he relies not only on *Thakker*'s reasoning,

finds that Petitioner lacks adequate documentation to substantiate an asthma diagnosis.   *See Jorge V.S.*, 2020 WL 1921936, at *1, 3 n.2 (denying petitioner's deliberate indifference claim based on his allegedly ongoing illness where, in both his petition and reply brief, he "presented no evidence regarding [the p]etitioner's [latest] medical condition other than the affidavit from [the p]etitioner's friend regarding [the p]etitioner's status" and concluding that the petitioner failed to show that "he suffers from a continuing medical condition requiring further treatment"). Moreover, the record does not reflect that Petitioner is presently exhibiting any symptoms of asthma.   Rather, on at least two occasions—one being in the last thirty days amidst the COVID-19 pandemic—Petitioner reported no difficulty breathing.  (HCCC Records at 66).  Although Petitioner seemingly admits that she only provided an "*excerpt* of her extensive asthma treatment records," the Court is not satisfied that a singular, year-old "excerpt" substantiates Petitioner's deliberate indifference claim based on asthma.   (Reply Br. at 5) (emphasis added).[12]

Moreover, while the record of Petitioner's anxiety, depression and/or PTSD diagnoses (collectively, Petitioner's purported "mental health conditions") is slightly more substantiated than Petitioner's asthma, it is nonetheless deplete of evidence suggesting that Petitioner has experienced or is currently experiencing any immunosuppressing symptoms that may be related to those mental health conditions.   (*See* Ex. C to Initial Petition (documenting PTSD, anxious distress and major depressive disorder); HCCC Records (documenting other depressive and anxiety disorders)).   For example, the record does not indicate that Petitioner had been or is presently experiencing

---

but also on *Thakker*'s record.").

[12]      Moreover, the Court remains doubtful that the Petitioner's purportedly "mild intermittent asthma" (Ex. B to Initial Petition) would fall under the category of "moderate to severe asthma" that the CDC considers as a high-risk medical condition at this juncture.   *See People Who Are at Higher Risk for Severe Illness*.

symptoms that have, in fact, triggered her asthma or that have resulted in any immunodeficiencies. *See Graham v. Decker*, No. 20-2423, 2020 WL 1847568, at *4 (S.D.N.Y. Apr. 13, 2020) (stating that although petitioner cited material describing "a *potential* for weakened immunity" as a result of his conditions, including "stomach ulcer, acute osteoarthritis, and diagnoses of Persistent Depressive Disorder and [PTSD]," he failed to "describe a personal history of immunodeficiency" on the current record) (emphasis added); *see also Buleishvili*, 2020 WL 1911507, at *1, 5–6 (denying deliberate indifference claim where the petitioner alleged his spinal surgery in 2004 and "long medical history" put him in the medically vulnerable COVID-19 category, noting that petitioner's "attached exhibits provid[ed] no additional detail," and concluding that there was "no evidence suggesting that his medical condition makes him uniquely susceptible to either contracting the virus or experiencing severe complications from the disease it causes").  Thus, notwithstanding that those with Petitioner's purported mental health conditions may have "a potential for weakened immunity," the current record does not reflect that Petitioner has a history of immunodeficiencies or is presently immunocompromised from her alleged mental conditions, such that she is more susceptible to contracting COVID-19 or to developing severe symptoms should she become infected with the virus.  *See Graham*, 2020 WL 1847568, at *4.  In addition, absent from the CDC's list of high-risk medical conditions are anxiety, depression, and PTSD. *See People Who Are at Higher Risk for Severe Illness*; *see also Graham*, 2020 WL 1847568, at *4 (taking judicial notice that the CDC does not list petitioner's aliments, including persistent depressive disorder and PTSD, as "presenting a heightened risk for COVID-19 complications").

Even if a detainee has documented evidence of a medical condition that increases his or her risk for contracting COVID-19, or for which contraction of COVID-19 poses particularly grave

-21-

risks, that does not, by itself, compel release under the deliberate indifference standard.   Rather, Petitioner must demonstrate that Respondents knew of a substantial risk to the Petitioner on the basis of her medical needs, and that Respondents failed to take adequate preventative measures to combat the spread of COVID-19 in light of those needs.   *See Farmer*, 511 U.S. at 837.   Based on the facts before this Court, Petitioner has failed to meet her burden.   The evidence submitted in support of Petitioner's request for release does not substantiate her purported asthma diagnosis or whether she is or has been immunocompromised from her alleged mental health conditions.   It follows that Petitioner similarly does not establish that Respondents know Petitioner has a higher risk of either contracting COVID-19 or developing severe symptoms from the virus.   Moreover, the record reflects that on March 31, 2020—the day immediately following Petitioner's request for parole based on the same purported medical conditions—Petitioner was evaluated by medical staff.   (*Compare* D.E. No. 1-4, *with* HCCC Records at 66).   Petitioner's lack of evidence on her purported medical conditions and immunodeficiencies, combined with HCCC's current measures to combat the spread of COVID-19 in the facility (*see supra*, Section I.D) as those measures relate to this specific Petitioner's purported conditions, leads this Court to conclude that Respondents are not deliberately indifferent to Petitioner's alleged underlying health conditions.

In relation to this specific Petitioner, the Court places weight on the various preventative measures implemented within HCCC.[13]   For example, the facility has provided inmates and detainees with access to soap, disinfecting wipes, and surgical masks.   (Edwards Decl. ¶¶ 19 & 24).   HCCC has a twenty-four hour on-call physician for emergencies, and it has medical staff,

---

[13]      The Court's analysis of HCCC's current measures have no bearing on claims asserted by any past or future petitioner detained or confined at the same facility or a different facility that implements similar preventative measures.

including registered nurses and nurse practitioners, onsite for twenty-four hours each day.   (*Id.* ¶ 7).   Medical staff visit cells to check on each inmate or detainee's medical and mental health twice daily.   (*Id.* ¶ 13(d)).   It retains specific housing units to quarantine those who are COVID-19 positive or suspected to be positive in accordance with the CDC's social distancing guidelines. (*Id.* ¶¶ 12(g) & 15–16).   The facility is cohorting asymptomatic, exposed detainees for a period of fourteen days.   (*Id.* ¶ 17).   Detainees and inmates are limited to one total hour per day outside of their cells in two thirty-minute increments while maintaining social distance.   (*Id.* ¶¶ 11 & 12(k)).   Moreover, new detainees and staff members seeking entry into the facility must pass medical assessments, which include temperature checks.   (*Id.* ¶ 12(a)–(c) & (g)).

The Court also affords some weight to the Declaration of Ms. Chua annexed to Petitioner's reply brief.   In particular, Petitioner's cellmate exhibited trouble breathing and chest pains, and Petitioner has not received gloves.[14]   (Chua Decl. ¶¶ 5 & 20).   However, despite Petitioner's representation that her cellmate has not been tested for COVID-19, Petitioner does not claim that her cellmate's symptoms have worsened since their onset—which was approximately two weeks prior to counsel's April 20, 2020 declaration.   (*See id.*).   Nor does the Declaration of Mr. Edwards state that HCCC currently gives gloves to *inmates* to combat the spread of the virus. (*See* Edwards Decl. ¶¶ 13(c) & 24).   Rather, consistent with Mr. Edwards's representations, Petitioner asserts that she received a mask.   (*Compare id.* ¶ 24, *with* Chua Decl. ¶ 5).   Significantly, Petitioner admits that she receives cleaning supplies once per day, which is also consistent with Mr. Edwards's sworn assertions.   (*Compare* Edwards Decl. ¶¶ 12(e), *with* Chua Decl. ¶ 7).   Nonetheless, to meet their constitutional obligations, Respondents' preventative

---

[14]      The Court notes that amongst others, these factual assertions appeared, for the first time, in Petitioner's reply brief and/or the Declaration of Ms. Chua.

measures need not guarantee the status quo of Petitioner's health or that she will never contract the virus.  *See Jorge V.S.*, 2020 WL 1921936, at *3 (citing *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861, at *6 (S.D. Tex. Mar. 27, 2020)).

Similarly, based on the current record, the Court does not find that Respondents acted with a deliberate indifference to Petitioner's purported requests for medical care and an inhaler. Petitioner claims that she has sought medical attention for her asthma "since arriving at the Hudson County Jail [in June 2019]" (Mov. Br. at 12; *see* Pet. ¶ 7), noting only two recent requests made on a computerized kiosk on or about March 20, 2020, and April 15, 2020.  (Chua Decl. ¶ 12). Significantly, Petitioner's medical records maintained by Respondents reflect that on March 31, 2020, roughly eleven days from her March request, Petitioner was evaluated by a medical professional and did not report any difficulty breathing.[15]  (HCCC Records at 66).  In addition, while the records are replete with Petitioner's various medical complaints, they do not make reference to any complaints or concerns raised by Petitioner relating to asthma.  (*See generally id.*).  These medical records are dated between June 2019 and March 2020, and do not contain any notation of Petitioner's alleged asthma.  (*See generally id.*).  Further, Respondents' lack of documentation regarding Petitioner's asthma and asthma-related requests does not compel the conclusion that Respondents inadequately track detainees' medical statuses.  (*See* Reply Br. at 6).[16]

---

[15]    Nor would "the exacerbation of symptoms . . . in and of itself, suggest that medical care has been deficient." *Camacho*, 2020 WL 1689874, at *7.

    Moreover, although Petitioner claims that Respondents were deliberately indifferent to Petitioner's "medical vulnerability at least since her parole request" dated March 30, 2020 (*see* Reply Br. at 11; D.E. No. 1-4), the documentation reflects that the very next day, on March 31, 2020, Petitioner was evaluated by medical staff.  (*See* HCC Records at 66).

[16]    While Petitioner cites to declarations by other HCCC detainees filed in different cases (*see* Pet. ¶ 21 n.11),

Accordingly, the Court denies Petitioner's claim alleging violations of due process under both theories of Respondents' alleged deliberate indifference to Petitioner's medical conditions, including: (i) their failure to provide adequate safety measures to prevent the spread of the virus, and (ii) their failure to provide her with adequate medical care.   To be clear, Court does not opine on whether, or to what extent, Petitioner's purported medical conditions, if substantiated, increase her risk of contracting COVID-19 or developing severe symptoms should she become infected. Rather, the Court's decision rests on its review of the record before it, which fails to substantiate Petitioner's purported asthma and does not document any past or present immunodeficiencies with respect to her mental health conditions.

### ii.        Punitive Conditions of Confinement Claim

Next, the Court will evaluate Petitioner's claim that her current conditions of confinement are punitive such that they amount to unconstitutional punishment.   (Pet. ¶¶ 55–60 & 73; Mov. Br. at 10–11).   The Supreme Court has stated that "[i]n evaluating whether a pretrial detainee's conditions of confinement violate his substantive due process rights, 'the proper inquiry is whether those conditions amount to punishment of the detainee.'"   *Umarbaev*, 2020 WL 1814157, at \*6 (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)); *see also Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2007).   Under *Bell*, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."   *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68).   The Court's "inquiry into whether given conditions

---

these declarations are not particularized to this specific Petitioner, and therefore do not support Petitioner's claim. *See Buleishvili*, 2020 WL 1911507, at \*5.

constitute 'punishment' must therefore consider 'the totality of circumstances within an institution.'"   *Hubbard*, 399 F.3d at 160 (quoting *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir. 1983)).

Here, the Court finds that there is no express intent to punish.   *See Rafael L.O. v. Tsoukaris*, No. 20-3481, 2020 WL 1808843, at *7 (D.N.J. Apr. 9, 2020); *Cristian A.R. v. Decker*, No. 20-3600 (D.N.J. Apr. 12, 2020).   Petitioner has not alleged as much.   But even without express intent to punish under *Bell*, punishment may be established "when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."   *Bistrian*, 696 F.3d at 373.   Here, immigration detention is, undoubtedly, reasonably related to a "legitimate non-punitive government purpose." *See id.*   The government has a legitimate interest in detaining immigrants who are subject to removal proceedings to ensure that they will not abscond or endanger the community pending removal proceedings, and to ensure that they appear for those proceedings.   *See, e.g.*, *Jorge V.S.*, 2020 WL 1921936, at *4; *Dawson v. Asher*, No. 20-0409, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020).   Moreover, the Court finds that HCCC's current measures to combat the spread of COVID-19 in relation to this specific Petitioner's purported medical conditions, as discussed at length above, are not excessive in relation to the government's legitimate purpose.   Thus, the Court concludes that Petitioner has not established a likelihood of success on the merits of her punitive conditions of confinement claim.

### B.   Irreparable Harm

The second prong of the balancing test for a temporary restraining order requires a movant to establish that he or she is "more likely than not" to suffer irreparable harm absent the requested

relief.  *Reilly*, 858 F.3d at 179.   Irreparable harm consists of an injury that is essentially irreversible, such that future legal remedies would not make the movant whole.   *See, e.g.*, *Anderson v. Davila*, 125 F.3d 148, 163 (3d Cir. 1997).   The harm alleged must be imminent and probable; mere risk of injury alone is insufficient.   *Camacho*, 2020 WL 1689874, at \*8.   "The requirements of irreparable harm and likelihood of success on the merits are correlative: that is, the weaker the merits showing, the more will be required on the showing of irreparable harm, and *vice versa*."   *Id.* (citing *Reilly*, 858 F.3d at 179).

To support her showing of irreparable harm, Petitioner argues that in light of the COVID-19 pandemic and her medical conditions, ICE's refusal to release her violates Petitioner's "due process rights because ICE is unable to protect her."   (Mov. Br. at 7 & 11).   She also contends that continued detention puts her health at imminent, high risk of serious illness or death, and constitutes substantial irreparable harm.   (*Id.* at 7 & 15).

Because Petitioner lacks evidence to substantiate an asthma diagnosis or to establish that she has been or is presently immunodeficient from her mental health conditions, she fails to establish that she is "more likely than not" to suffer irreversible harm by remaining in detention at HCCC.   *Reilly*, 858 F.3d at 179; *see Graham*, 2020 WL 1847568, at \*7.   Moreover, the threat of COVID-19 alone—when viewed against Petitioner's unsubstantiated asthma diagnosis and immunodeficiencies as well as HCCC's efforts to combat the virus's spread in light of Petitioner's purported medical conditions—cannot be the sole basis for irreparable harm.   *See United States v. Raia*, No. 20-1033, 2020 WL 1647922, at \*2 (3d Cir. Apr. 2, 2020) (stating, in the context of a request for compassionate release under the First Step Act, that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently

justify compassionate release").   Accordingly, Petitioner has not shown that she will suffer irreparable harm absent release from ICE custody.

### C.    Balancing of Equities

Because the Court finds that Petitioner has failed to meet her burden with respect to the "most critical" factors—likelihood of success on the merits and irreparable harm—the Court need not address the two remaining factors, including harm to the nonmoving party and the public interest.   *See Reilly*, 858 F.3d at 176, 179.   Accordingly, the Court denies Petitioner's request for a preliminary injunction and temporary restraining order for release from ICE custody.

### D.    Extraordinary Circumstances

Because Petitioner requests a bail hearing in the alternative, the Petitioner's arguments for release on bail under the extraordinary circumstances standard are identical to those proffered under the standard for a preliminary injunction and temporary restraining order.   (*See* Pet. ¶¶ 66, 69–71 & at 49 n.79; Mov. Br. 5).   The Court is well aware of the unprecedented COVID-19 pandemic, and its global effect on society.   Nonetheless, in the absence of additional evidence noting an asthma diagnosis and without any evidence indicative of whether Petitioner has past or present immunodeficiencies related to her purported mental health conditions, the Court finds that Petitioner does not establish the existence of an extraordinary circumstance to justify release. *See Ousman D.*, 2020 WL 1847704, at *8–10; *Francisco M. v. Decker*, No. 20-2176 (D.N.J. Mar. 25, 2020) (holding that petitioner failed to show extraordinary circumstances for bail, noting that petitioner's purported depression, "perhaps [a] natural result of being [lawfully] detained," was "not the sort of serious medical issue which the Third Circuit has found to warrant bail for state prisoners" seeking habeas relief); *see also Landano*, 970 F.2d at 1239 (indicating that a court may

only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *In re Souels*, 688 F. App'x at 135–36. Moreover, as detailed above, in light of Petitioner's purported conditions, HCCC has implemented a variety of measures to combat the spread of the virus amongst detainees and staff.   (*See generally* Edwards Decl.).   Accordingly, the Court denies Petitioner's request for bail under the extraordinary circumstances standard.[17]

## V.     Conclusion

For the reasons discussed above, Petitioner's habeas corpus Petition, and Motion for an order to show cause, preliminary injunction and temporary restraining order are DENIED, *without prejudice*.   An appropriate order follows.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

[17]     Because the Court denies Petitioner's claims for the reasons stated herein, the Court need not consider additional arguments raised by Respondents, including, for example, that Petitioner's release cannot address her alleged harms.   (Opp. Br. at 28).

-29-